Appendix A

Mary C. RICHARDS, Plaintiff,

v.

Shirley S. CHATER, Commissioner

of Social Security, Defendant.

No. 4:96CV00655 GFG.

United States District Court,

E.D. Missouri,
Eastern Division.

April 1, 1997.

**ORDER**

GUNN, District Judge.

This matter is before the Court on the Report and Recommendation of the Honor-

able Frederick R. Buckles, United States Magistrate Judge. Document 12. The parties have filed no objections to the Report and Recommendation. Upon review of the Report and Recommendation,

**IT IS HEREBY ORDERED** that Magistrate Judge Buckles's Report and Recommendation is sustained, adopted and incorporated herein. Accordingly,

**IT IS FURTHER ORDERED** that pursuant to Magistrate Judge Buckles's Report and Recommendation plaintiff's motion for summary judgment, Document 8, is **DENIED.**

**IT IS FURTHER ORDERED** that pursuant to Magistrate Judge Buckles's Report and Recommendation defendant's motion for summary judgment, Document 11, is **GRANTED.** The Court will issue herewith a separate judgment.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

BUCKLES, United States Magistrate Judge.

This cause is before the Court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

### I. Procedural History.

On June 28, 1993, plaintiff Mary C. Richard filed an application for disability insurance benefits (DIB) pursuant to Title II, 42 U.S.C. §§ 401, *et seq.* (Tr. 211–13), and an application for supplemental security income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (Tr. 155–58).[1] On December 10, 1993, an application for child's insurance benefits (CIB) was filed on behalf of plaintiff pursuant to Title II, 42 U.S.C. §§ 401, *et seq.*, in which it was alleged that plaintiff has been disabled since birth. (Tr. 205–10.) Plaintiff was born on

July 1, 1957. (Tr. 145.) On initial consideration (Tr. 180–83, 151–54, 114–16, 141) and on reconsideration (Tr. 161–64, 148–50, 122–24, 126), the Social Security Administration denied plaintiff's claims for benefits.

On December 29, 1994, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 37–63.) Plaintiff testified and was represented by counsel. (Tr. 54–60, 61.) Plaintiff's former sister-in-law and plaintiff's brother also testified at the hearing. (Tr. 41–53, 60–63.) On January 4, 1995, the ALJ issued a decision in which he found plaintiff to have been under a disability since January 1, 1993, and thus entitled to DIB and SSI. The ALJ denied plaintiff's claim for CIB. (Tr. 16–29.) The Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 2–3.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

### II. Evidence Before the ALJ

#### A. *Testimony of Shannon Richard*.

At the hearing on December 29, 1994, Shannon Richard, plaintiff's former sister-in-law, testified in response to questions posed by the ALJ and counsel. Shannon was previously married to plaintiff's brother, Gregory. (Tr. 51.) Shannon testified that she has known plaintiff for four or five years. (Tr. 41.) Shannon testified that plaintiff has lived with her in her home for two years. (Tr. 42, 51.) Shannon testified that plaintiff cannot live alone and needs assistance at all times because plaintiff cannot take care of herself. Shannon testified that plaintiff cannot manage money, needs to be told how to dress properly, and needs to be told how to cook. (Tr. 43.) Shannon testified that she feels obligated to take care of plaintiff because she promised plaintiff's mother that she would take of her. (Tr. 42.) Plaintiff's mother is now deceased. (Tr. 43.) Shannon testified that she works at Ben Franklin during the day but sometimes works at night, and that she has taken plaintiff to work with her in the past. (Tr. 41, 49–51.) Shannon testified that she buys everything to meet plaintiff's needs and that she sometimes gets financial

---

1. Plaintiff alleged in her DIB application that she became disabled on January 1, 1993. (Tr. 211.) In her SSI application, plaintiff claimed that she

became disabled on June 7, 1993, due to a nervous condition. (Tr. 155.)

assistance from plaintiff's family. (Tr. 44–45.) Shannon testified that plaintiff has five brothers and three sisters and has never been married. (Tr. 51.)

Shannon testified that she prepares a daily schedule for plaintiff and requires plaintiff to write down when she completes various items on the schedule. Shannon testified that plaintiff does not always meet the schedule and has difficulty "time-wise." (Tr. 43.)

Shannon testified that if plaintiff were allowed to dress herself, her clothes would not match and she would wear inappropriate clothing, such as "something short sleeved in 30 degree weather." (Tr. 44.) Shannon testified that it takes approximately two and one-half hours to get plaintiff ready for church, that is, to shower, get dressed and eat a bowl of cereal. Shannon testified that plaintiff needs assistance with grocery shopping and will buy only cookies, ice cream and cereal when she shops alone. (Tr. 44.) Shannon testified that plaintiff has a checking account but that there is less than one dollar in the account. Shannon testified that plaintiff has no money and owns only a dresser. (Tr. 45.)

Shannon testified that plaintiff has a driver's license but that she will not allow plaintiff to drive inasmuch as plaintiff cannot drive and has been involved in two accidents. (Tr. 45.) Shannon testified that plaintiff has poor judgment. Shannon testified that plaintiff attends to various things in a hazardous manner, such as repairing electrical cord with scotch tape and cleaning the garage by discarding items into a wood burning furnace. (Tr. 46.)

Shannon testified that plaintiff becomes involved with people who get her into trouble and cause her to become harmed. Shannon testified that plaintiff had previously jumped off of a balcony after she had been taking drugs with friends. (Tr. 47.) Plaintiff was hospitalized for observation after this incident. (Tr. 48.)

Shannon testified that plaintiff previously worked at Famous Barr. Shannon testified that plaintiff's mother worked at Famous Barr and that she and two other women coached plaintiff on the job. Shannon testified that plaintiff was able to do the work because the coaches were very tolerant of plaintiff's slow pace. (Tr. 48.) Shannon testified that plaintiff needed a coach to perform any work because plaintiff was very slow and lacked initiative to do things on her own. Shannon testified that plaintiff will do exactly what she is told to do and nothing else. Shannon testified that plaintiff worked with her at Ben Franklin for three days lining up pegs on a pegboard. (Tr. 49.) Shannon testified that if she had performed the job herself, she would have completed it in half an hour, and that a new employee recently trained would have completed the job in an hour. (Tr. 50.) Shannon testified that she also had plaintiff organize boxes of clay and fold fabric, but that plaintiff was too slow in her work. (Tr. 50–51.)

Shannon testified that plaintiff does not have a realistic view of her abilities because plaintiff is praised for the work she does. Shannon explained that she praises plaintiff rather than criticizes her because of society's view of the mentally handicapped. Therefore, Shannon testified, plaintiff believes that "everything she does is wonderful." (Tr. 52.)

### B. *Plaintiff's Testimony*

Plaintiff testified in response to questions posed by the ALJ and counsel. Plaintiff is a high school graduate and was enrolled in a secretarial course for one year at a technical school. Plaintiff did not return for a second year at the technical school because the coursework was very difficult. Plaintiff has never had any secretarial jobs. (Tr. 55.) Plaintiff testified that her only income is $115.00 per month in food stamps. (Tr. 61.)

Plaintiff testified that she previously worked in the fast food industry, did temporary work and was employed in "cleaning jobs." (Tr. 55.) Plaintiff's Vocational Report shows that plaintiff worked in food service at Famous Barr from March 1974 through May 1977 and from November 1977 through May 1980. (Tr. 216.) Plaintiff testified that she began working when she was sixteen years old at Famous Barr and that the job went "all right." (Tr. 58.) Plaintiff testified that while at Famous Barr, she was trained and supervised by Martha Bartow-

skiwitz and Karen Cramer. (Tr. 58.) Plaintiff's Vocational Report shows that plaintiff worked in food service at Ponderosa Steak House from May 1980 to August 1980; at St. Joseph Hospital from August 1980 to January 1981; and at Seven Kitchens from July 1982 to April 1983. Plaintiff's Vocational Report shows that plaintiff worked at Lion's Choice Restaurant from August 1983 to March 1990. (Tr. 216.) Plaintiff testified that she worked approximately thirty hours a week at Lion's Choice but that her hours were subsequently decreased. (Tr. 56.) Plaintiff testified that she initially worked as a bagger at the restaurant filling orders and giving the customers their food. Plaintiff testified that when her employer saw that she could not perform that type of work, plaintiff was moved to the back room where she · washed dishes, scrubbed walls and cleaned floors. Plaintiff testified that her employer always told her to do her job better and faster which caused plaintiff to become confused and stressed. (Tr. 57.) Plaintiff's Vocational Report shows that plaintiff worked at Hardee's Restaurant from May through August 1988. Plaintiff worked at Haefner's Greenhouse from March through August 1989. From January 1992 to April 1993, plaintiff worked in the kitchen at Pizza Hut Restaurant. From August through December 1992, plaintiff worked through Kelly Temporary Services performing light industrial work. (Tr. 216.) Plaintiff testified that she left Kelly Temporary Services because clients would call and request that plaintiff not be assigned to them for the reason that plaintiff was too slow in her work. (Tr. 59.) In September and October 1992, plaintiff performed janitorial work at J.C. Penney. (Tr. 216.) Plaintiff testified that she also was employed as a telemarketer but that she was released from the job after three hours because the employer "could not use [her]." (Tr. 59.) Plaintiff testified that she also worked at a sheltered workshop where she was paid for the work she was able to complete. Plaintiff testified that she worked at this workshop five days a week and earned approximately $20.00 to $25.00 a week. Plaintiff testified that she left the workshop because the job made her nervous and she was unable to keep pace with the other workers. (Tr. 56.)

Plaintiff testified that she cross-stitches and cares for a puppy that Shannon gave her for her birthday. (Tr. 60.) .

### C. Testimony of David Richard

David Richard, plaintiff's brother, testified at the hearing in response to questions posed by the ALJ and counsel. David testified that plaintiff was not presently under the care of a doctor nor did plaintiff take any medication. (Tr. 60.) David testified that plaintiff has had emotional problems since she was born. (Tr. 61.) David testified that plaintiff was able to remain employed at Famous Barr only because plaintiff's mother worked there as well. David testified that plaintiff cannot sustain herself and needs supervision twenty-four hours a day. (Tr. 62.)

### III. Medical Records

When plaintiff was two months old, she was admitted to St. Joseph's Hospital with a left inguinal hernia. Surgery was performed on September 20, 1957, and the hernia was repaired. Plaintiff suffered no complications during surgery or recovery and she was discharged from the hospital on September 22, 1957. (Tr. 281–90.)

On September 27, 1990, plaintiff was admitted to St. Anthony's Medical Center after taking about twenty "white cross" amphetamines. Plaintiff was thirty-three years of age. Plaintiff's parents reported that plaintiff had gotten into a fight with her girlfriend and that she had been depressed because she was unemployed. Dr. S. Mirza noted plaintiff to have some learning difficulty. Plaintiff was kept overnight for observation and was released the next day. Plaintiff's discharge diagnosis was drug overdose. (Tr. 276.)

On February 13, 1992, plaintiff underwent a general medical examination for vocational rehabilitation. (Tr. 333–34.) Plaintiff complained that she had been nervous all of her life and that she could not concentrate. (Tr. 333.) After examination, plaintiff was diagnosed as having nervousness/anxiety disorder and a speech disorder. It was noted that plaintiff should avoid climbing and walking on heights. It was noted that plaintiff could

engage in routine light duty, such as a factory-type job. (Tr. 334.)

On May 11, 1992, plaintiff underwent a qualitative neuropsychological evaluation by psychologist Peggy R. Goldfader for vocational rehabilitation. (Tr. 263–75.) Plaintiff reported a history of developmental delays and learning disability and stated that her damaged condition was on account of the administration of too much oxygen during her hernia operation when she was an infant. (Tr. 263.) Plaintiff reported that she sustained a head injury when she was between eight and twelve years of age but that she experienced no cognitive changes. (Tr. 268.) Plaintiff reported that she began attending the Special School District while in second or third grade and continued there until high school graduation. (Tr. 263.) Plaintiff reported that she earned A's, B's and C's in high school but earned B's through F's in technical school. Plaintiff reported that she had a nervous condition since childhood and that she experiences a lot of stress and overworks herself. Plaintiff reported that she had previously attempted suicide by drug overdose. (Tr. 264.)

Ms. Goldfader observed plaintiff to be mildly anxious and to present a generally flat affect. Ms. Goldfader noted that on several occasions, plaintiff did not listen to all of the instructions before beginning a task. Ms. Goldfader observed plaintiff to be motivated and persistent on difficult tasks with little need of encouragement. (Tr. 264.) Testing showed plaintiff to have low-average to average range of intelligence with evidence of mild cerebral dysfunction. Reading and written language on achievement testing showed plaintiff's abilities to be at a grade equivalent of 12.9. (Tr. 265.) Arithmetic level on achievement testing was shown to be at a grade equivalent of 6.6. (Tr. 267.) At the conclusion of extensive testing, Ms. Goldfader opined that the test results were not consistent with a learning disability. Ms. Goldfader noted that plaintiff's memory and intellect were average and without disparity; that plaintiff's attention and concentration levels were good; that plaintiff learned and retained new information at an average level, which was consistent with her intellectual level; and that plaintiff's psychomotor speed was usually adequate. Ms. Goldfader noted plaintiff to have lower performance in fine motor speed; that plaintiff had speech problems; and that plaintiff engaged in poor planning and organization, most notably in complex tasks and mathematics. Ms. Goldfader observed that test results showed plaintiff not to be experiencing depression or undue anxiety. (Tr. 269.)

Ms. Goldfader concluded that plaintiff did not meet the criterion to be considered learning disabled or suffering from a brain dysfunction. Ms. Goldfader opined that plaintiff's areas of average functioning coupled with areas of lower performance would require a work setting that did not demand speeded performance or involve the use of arithmetic skills. Ms. Goldfader suggested that plaintiff's employment involve repetitive tasks. Ms. Goldfader opined that plaintiff should be able to learn structured job tasks which involve some structured decision-making. Specifically, Ms. Goldfader concluded that plaintiff "may have the capacity to work in low level jobs, but at a much higher level than the sheltered workshop" in which she was presently working. (Tr. 269.) Ms. Goldfader questioned whether ongoing counseling would benefit plaintiff inasmuch as she reported suffering from a "nervous condition" all her life, even though plaintiff currently suffered no depression or anxiety. (Tr. 269.)

On July 29, 1992, the Missouri Department of Mental Health completed a Critical Adaptive Behaviors Inventory in which it was found that plaintiff had no substantial functional limitation in the areas of self care, receptive and expressive language, learning, mobility, self direction, or capacity for independent living or economic self sufficiency. However, it was determined that further assessment was required inasmuch as there was insufficient evidence to document whether plaintiff was substantially functionally limited. (Tr. 320–27.)

On August 27, 1992, plaintiff underwent a psychological assessment conducted by psychologist Bonnie B. Walbran and associate psychologist Penny Willmering. (Tr. 328–32.) It was noted that plaintiff drove herself

to the assessment and did not appear to have fine or gross motor problems. (Tr. 328.) The examiners noted past evaluations performed by the Special School District: that in January 1964, plaintiff had an IQ of 61; in 1967, plaintiff had a full-scale IQ of 75; and in March 1971, plaintiff had a full-scale IQ of 91. The examiners also noted that the Center for Psychological Services (Center) measured plaintiff's full-scale IQ in 1978 to be 90; that plaintiff's academic scores ranged from the sixth to ninth grades; and that social maturity was measured to be a score of 86. The examiners noted that the report from the Center stated, "[T]est results indicate a notable disability or dysfunction, very likely on an organic basis, which specifically impairs abstract thinking.... Competence in general, everyday matters is below potential, mostly due to restricted experiences." (Tr. 330.) The examiners also noted that in 1989, the Division of Vocational Rehabilitation measured plaintiff's full-scale IQ to be 83 and determined plaintiff to have borderline intellectual functioning and borderline personality disorder. (Tr. 330.) The qualitative neuropsychological evaluation conducted in May 1992 was also noted as well as the July 1992 interview conducted by the Missouri Department of Mental Heath. (Tr. 331.)

The examiners administered the Vineland Adaptive Behavior Scales to plaintiff and found plaintiff to have communication skills equivalent to age "14–9"; daily living skills equivalent to age "6–11"; socialization skills equivalent to age "4–5"; and an adaptive behavior composite equivalent to age "8–7." (Tr. 331.) Based upon the results of the previous evaluations (described above), the results of the current evaluation, review of the records, and clinical observations, the examiners opined that plaintiff showed paranoid behavior with a tendency to be avoidant and passive-aggressive. (Tr. 331.) The examiners concluded plaintiff to have a "Personality Disorder, Not Otherwise Specified," but that her condition did not appear to significantly affect plaintiff's adaptive functioning. They found that plaintiff

> demonstrated the ability to complete self care needs, and to express her wants and needs. She negotiates independently within the community, including driving her

car. Her ability to learn new tasks does not appear to be impaired, and her ability to work independently appears impaired more by choice rather than by an inability to complete tasks. It may be that she has some difficulties with self direction and initiating activities, but again this appears to be a matter of choice rather than an inability to do so.

(Tr. 332.)

The examiners recommended that plaintiff be referred for mental health services and that she continue with vocational rehabilitation. (Tr. 332.)

Plaintiff was seen at Bridgeway Counseling Services (Bridgeway) on April 14, 1993, for counseling relating to substance abuse. (Tr. 315–16.) Plaintiff used marijuana on a daily basis and plaintiff's parents referred her to Bridgeway for assessment. Plaintiff reported that she threw herself over a bannister in an attempt to have her brother stop abusing her dog. Plaintiff stated that this was not a suicide attempt. Plaintiff also reported that she had previously overdosed on drugs in an attempt to have her friends stop harassing her and not as a suicide attempt. Plaintiff reported that she began using marijuana when she was seventeen years old. When plaintiff was twenty-two years of age, plaintiff began to use marijuana three or four times a week. For two or three years, plaintiff used marijuana on a daily basis. Plaintiff reported that during the previous three or four months, she had been using marijuana on a daily basis. (Tr. 315.) Plaintiff reported that in addition to marijuana, she had tried acid, speed and downers in the past. Plaintiff reported that in addition to her daily use of marijuana, she was becoming more tolerant of and losing control of the drug. Plaintiff reported that she was preoccupied and that she had suffered a social and occupational impairment due to her ingestion of marijuana. Specifically, it was noted that plaintiff lost her job with Famous Barr after seven years of employment. It was recommended that plaintiff enter residential care for her condition. (Tr. 316.)

On April 28, 1993, plaintiff complained to her general physician of pain in her right

shoulder and low back. X-rays were taken and plaintiff was prescribed medication. (Tr. 306.)

On May 5, 1993, plaintiff reported to Bridgeway that she used marijuana three times a day and that she had been using marijuana on a daily basis since she was sixteen years old. Plaintiff reported that she became brain damaged as an infant due to anoxia and because of the administration of too much oxygen during her hernia surgery. It was noted that plaintiff had difficulty obtaining and maintaining employment. (Tr. 314.) Plaintiff reported that "she always finds jobs and is able to do it for a period of time depending on what the demands are" but that she is not able to work as fast as the other employees. (Tr. 314, 317.) Dr. Monica Minkoff noted that plaintiff was "of lower intellagance [sic] or at least appears to be" and that plaintiff "makes a lot of griminces [sic]." (Tr. 317.) Dr. Minkoff determined plaintiff to be marijuana dependent and to have possible brain damage secondary to surgery. (Tr. 317.)

On May 12, 1993, the Missouri Department of Mental Health diagnosed plaintiff with Personality Disorder, NOS; and borderline intellectual functioning. (Tr. 318.)

On May 17, 1993, plaintiff had a women's health physical exam at which it was noted that plaintiff continued to have back pain. Plaintiff also complained of nasal congestion and tightness of the chest. Plaintiff was prescribed medications for her condition. It was noted that plaintiff lived in a "women's home" and was doing fine. (Tr. 305.) On June 23, 1993, plaintiff visited her doctor and complained of burning and itching upon urination. Plaintiff was diagnosed with urinary tract infection and was prescribed medication for her condition. (Tr. 304.) On July 2, 1993, it was noted that plaintiff's doctor suggested that plaintiff undergo "immediate evaluation" for the presence of a sexually transmitted disease. (Tr. 303.) On July 12, 1993, it was noted that plaintiff's herpes condition was resolving. (Tr. 302.)

In a letter dated July 22, 1993, a counselor at Bridgeway informed Disability Determinations of the following:

I am writing to advise you that Mary Richard received treatment from our center from 05–04–93 to 06–17–93. She is chemically dependent on marijuana.

Ms. Richard made very little progress while in treatment. She did not work willing on the goals set for her. She appeared emotionally unstable and her mood fluctuated.

Ms. Richard was unable to get along with other clients and staff. She oftened [sic] would pout if she did not get her way. She would yell and use inappropriate language.

(Tr. 313.)

On August 18, 1993, Dr. Mehdi Moghaddas conducted a psychiatric examination of plaintiff for a disability determination. (Tr. 309–11.) Plaintiff complained that she felt nervous. Plaintiff reported that she was brain damaged on account of anesthesia received during surgery as an infant. Plaintiff reported that her disability prevented her from functioning on any assigned job and that she could not focus or concentrate. Plaintiff reported that she is not comfortable around people and stays by herself most of the time. Plaintiff reported that she cannot relax or handle things well. (Tr. 309.) Dr. Moghaddas noted "no history of any . . . drug abuse" and noted that plaintiff quit her job at Famous Barr because she tired easily. (Tr. 310.) Upon examination, Dr. Moghaddas diagnosed plaintiff with Organic Mental Disorder Not Otherwise Specified and found that plaintiff's motivation was fair to poor with low self reliance. Plaintiff's prognosis was guarded. Dr. Moghaddas concluded that plaintiff presented signs and symptoms of cortical dysfunction which compromised her ability to withstand stress and normal stressors associated with day to day activities. Plaintiff's self esteem and self reliance were found to be low. Dr. Moghaddas found that plaintiff had difficulty performing complex tasks. Plaintiff had a fair ability to understand and follow simple instructions. Plaintiff showed poor motivation for rehabilitation and was impaired in her competence to conform and adjust with normal everyday matters. (Tr. 311.)

On April 12, 1994, Dr. Shael S. Bronson conducted a psychiatric examination of plaintiff. (Tr. 336–38.) Plaintiff complained that she had "troubles with nerves and depression." (Tr. 336.) Plaintiff reported that she could not get a job because she is too nervous to work. Plaintiff denied any substance abuse. (Tr. 336.) Examination showed plaintiff to have slow psychomotor activity. Plaintiff engaged in no eye contact, had a dull affect and had no spontaneous verbalizations. Dr. Bronson noted plaintiff to be passive and indifferent. Dr. Bronson noted that plaintiff was "uninformative, vague, noncommittal, extremely passive. She gives only a very impoverished personal history with doubtful validity." (Tr. 337.) Plaintiff appeared apathetic with sometimes a "suggestably depressed affect." (Tr. 337.) Dr. Bronson noted plaintiff's calculating ability to be extremely slow and that insight was extremely limited. As to plaintiff's ability to relate to others, Dr. Bronson found plaintiff to be clearly asocial. Plaintiff stated that she was lazy when attending to her personal needs. Plaintiff described no goal-directed activity. (Tr. 337.) Dr. Bronson diagnosed plaintiff with depression, recurrent; learning disorder with low average intelligence; and migraine by history. Dr. Bronson opined that plaintiff was "not feasible ... for rehabilitation, or re-educatin [sic] at the present time except with concurrent active antidepressant psychiatric management." (Tr. 338.) Dr. Bronson recommended counseling and antidepressant medication. Dr. Bronson opined that plaintiff would be capable only of simple repetitive tasks in a sheltered workshop. (Tr. 338.)

On August 16, 1994, psychologist Samuel Bernstein examined plaintiff at the request of plaintiff's counsel. (Tr. 291–96.) Plaintiff's personal, psychological and medical history were noted. (Tr. 291–95.) Plaintiff reported that she worries about her health, is always agitated and has difficulty concentrating. (Tr. 292.) Plaintiff reported that she becomes very nervous if time restrictions are placed on her, thus causing her to become tense, worried and unproductive. (Tr. 293.) Plaintiff stated that she feels downhearted and sad on most days, and that she has thought of and attempted suicide in the past. (Tr. 293, 295.) Mr. Bernstein noted a history

of substance abuse, but that plaintiff no longer drank or took drugs. Mr. Bernstein also noted that plaintiff overdosed on drugs in the past "when she was associating with some undesirable people" but noted that "this problem has been overcome." (Tr. 293.)

Mr. Bernstein noted plaintiff's history of developmental delays, learning disabilities and psychiatric illness, and found plaintiff to continue to suffer a degree of depression although with less stress in her life. (Tr. 293.) Upon reviewing past evaluations, Mr. Bernstein found plaintiff's "learning disorders [to be] directly related to her psychological manifestations in her life" and noted plaintiff to be dramatically affected when involved in a stressful situation. (Tr. 293–94.) It was noted that in a work environment, plaintiff expressed hostility toward supervisors, had difficulty relating to co-workers, and had difficulty meeting time schedules. (Tr. 294.)

Mr. Bernstein concluded that, at best, plaintiff could be employed only in a protected work setting with an "understanding and loving" job coach, but determined that, overall, plaintiff was unable to function in a work situation and thus unemployable. (Tr. 295–96.) Mr. Bernstein determined that plaintiff's problems with relationships and meeting schedules were most significant in his evaluation. Mr. Bernstein also concluded that plaintiff needed "loving supervision in her daily life." (Tr. 295.) Mr. Bernstein opined that plaintiff required ongoing psychological and medical treatment, noted that plaintiff was currently undergoing no treatment, and recommended that plaintiff's condition be reviewed by a competent psychiatrist to determine whether plaintiff could be helped. (Tr. 296.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on January 1, 1993, and would continue to meet them through December 31, 1997. The ALJ also found that plaintiff had not engaged in substantial gainful activity since January 1, 1993. (Tr. 22.) The ALJ found plaintiff's impairments to be severe marijuana dependence, depression,

and/or personality disorder, and/or organic mental disorder, and/or impairment with normal IQ, but that she does not have an impairment or combination of impairments listed in, or medically equivalent to, one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's allegation of disability since January 1, 1993, to be credible but that plaintiff's allegation of disability since birth not to be convincing. (Tr. 23.) The ALJ found plaintiff to have the residual functional capacity to perform work except for being able to interact appropriately, withstand the pressure of day to day work, or perform any sustained competitive work. (Tr. 23.) The ALJ found that plaintiff could not perform her past relevant work in food service. Considering plaintiff's age, education, lack of transferrable work skills, and capacity for work, the ALJ found plaintiff not to be able to make a vocational adjustment to work which exists in significant numbers in the national economy. (Tr. 23–24.) The ALJ thus concluded that plaintiff was under a disability since January 1, 1993, and ordered benefits to be awarded accordingly. (Tr. 24.) In addition, however, the ALJ noted that plaintiff's drug dependence was material to his decision (Tr. 22) and thus conditioned plaintiff's receipt of benefits upon plaintiff's participation in appropriate treatment for her drug addiction. (Tr. 22, 24.) The ALJ denied plaintiff's claim for child's benefits. (Tr. 22.)

## V. Discussion

■ To be eligible for Social Security disability benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. *Baker v. Secretary of Health and Human Services,* 955 F.2d 552, 555 (8th Cir.1992). To satisfy this initial burden, plaintiff must show that she has a "medically determinable impairment which precludes performance of previous work." *Turpin v. Bowen,* 813 F.2d 165, 170 (8th Cir.1987). *See also Johnston v. Shalala,* 42 F.3d 448 (8th Cir.1994). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520 (1995); *Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

■ The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Groeper v. Sullivan,* 932 F.2d 1234, 1237 (8th Cir.1991). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the

conclusion. *Robinson v. Sullivan,* 956 F.2d 836, 838 (8th Cir.1992).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health and Human Services,* 957 F.2d 581, 585–86 (8th Cir.1992) (quoting *Cruse v. Bowen,* 867 F.2d 1183, 1184–85 (8th Cir.1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." *Groeper,* 932 F.2d at 1237. However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. *Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir.1992) (citing *Cruse,* 867 F.2d at 1184).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ erred when he found that drug dependence was a contributing factor material to a finding of disability. In addition, plaintiff argues that the ALJ erred when he found plaintiff not to be disabled prior to attaining twenty-two years of age and thus not entitled to child's benefits.

### A. Drug Dependence

Plaintiff claims that the ALJ erred when he found plaintiff's disability to be due to plaintiff's drug dependence. Specifically, plaintiff argues that the weight of the evidence shows plaintiff's disability to be unrelated to drug dependence and that the evidence shows plaintiff's drug problem to have resolved.

If a finding is made that a claimant is disabled and there is evidence of drug addiction before the Commissioner, the Commissioner "must determine whether [the] drug addiction ... is a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935(a). In making this determination, the Commissioner must determine whether a claimant would still be found to be disabled if the claimant stopped using drugs. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). If so, then the drug addiction is not a contributing factor material to the finding of disability. 20 C.F.R. § 404.1535(b)(2)(ii), 416.935(b)(2)(ii). However, if a claimant's remaining limitations—absent the drug addiction—would not be disabling, then the drug addiction is a contributing factor material to the finding of disability. 20 C.F.R. § 404.1535(b)(2)(i), 416.935(b)(2)(i).[2]

---

2. On March 29, 1996, subsequent to the Appeals Council's denial of review but prior to plaintiff's appeal to the district court, the Contract With America Advancement Act of 1996 was enacted. P.L. No. 104–121, 110 Stat. 847 (1996). Under Section 105 of the Act, any person whose drug addiction is found to be a contributing factor material to a finding of disability cannot be considered disabled and entitled to benefits. P.L. No. 104–121 §§ 105(a)(1) (amending Title II of the Social Security Act), 105(b)(1) (amending Title XVI of the Social Security Act). In addition, the Act struck Section 1611(e)(3) of the Social Security Act (42 U.S.C. § 1382(e)(3)), under which the ALJ in the instant cause awarded plaintiff conditional benefits. P.L. No. 104–121 § 105(b)(4)(A). The provisions of the Act apply to "any individual who applies for, or whose claim is finally adjudicated by the Commissioner of Social Security with respect to, benefits under [titles II and XVI] of the Social Security Act based on disability on or after [March 29, 1996], and, in the case of any individual who has applied for, and whose claim has been finally adjudicated by the Commissioner with respect to, such benefits before such date ... such amendments shall apply only with respect to such benefits for months beginning on or after January 1, 1997." P.L. No. 104–121 §§ 105(a)(5)(A), 105(b)(5)(A). Because neither party addressed the applicability of the Act to the instant cause, the undersigned does not address the implications of the Act here.

■ In the instant cause, the ALJ found plaintiff's drug dependence to be material to his finding that plaintiff was disabled. In his written decision, the ALJ discussed in detail plaintiff's work history, the various examinations and evaluations performed, and the conclusions made therefrom. In reaching his conclusion that drug dependency was material to his finding of disability, the ALJ stated:

The evidence shows that, although the claimant was in special education during her childhood, she was able to work at the substantial gainful level for many years. Her mental status has deteriorated significantly in recent years. Psychological and neuropsychological testing in 1992 showed that the claimant could learn new material and could perform repetitive tasks. However, in 1993, the claimant was found to be dependent on marijuana. Psychiatric and psychological evaluation after this revealed that the claimant could not withstand stress, deal with supervisors or coworkers and was depressed with low frustration tolerance. Dr. Bernstein concluded that she was unemployable. Therefore, the undersigned concludes that the claimant has been disabled since she alleges becoming disabled and when she was last employed, January 1, 1993. Earlier disability has not been established because, prior to 1993, the claimant was working and all evaluators were of the opinion that the claimant could perform simple repetitive tasks but at a higher level than just sheltered work. The undersigned is of the opinion that the marijuana addiction markedly decreased the claimant's ability to concentrate, interact in an emotionally stable manner and function independently.

(Tr. 21–22.)

This finding is supported by substantial evidence on the record as a whole. Before 1993, various examiners and evaluators found plaintiff to be able to engage in work activity. In February 1992, examiners for vocational rehabilitation found that plaintiff could engage in routine light duty, such as factory-type jobs. In May 1992, Psychologist Goldfader found plaintiff to be motivated and persistent on difficult tasks with little need of encouragement. Plaintiff was found to have low-average to average range of intelligence with testing results within the sixth to twelfth grade range. Ms. Goldfader opined that plaintiff did not suffer from a learning disability or brain dysfunction and determined that plaintiff could engage in work which involved repetitive tasks. Ms. Goldfader also found that plaintiff could learn structured job tasks with structured decision-making, and that plaintiff could work at a much higher level than a sheltered workshop. In July 1992, the Missouri Department of Health found plaintiff not to have substantial functional limitations in daily living. In August 1992, psychologists diagnosed plaintiff with Personality Disorder, Not Otherwise Specified, but found the condition not to significantly affect plaintiff's adaptive functioning. It was found that plaintiff could negotiate independently in the community; that plaintiff could learn new tasks; and that plaintiff's capacity to work independently was impaired by choice rather than ability. It was recommended that plaintiff continue with vocational rehabilitation.

In 1993, after plaintiff's drug use became a daily habit and plaintiff was diagnosed as being drug dependent, plaintiff's ability to engage in work-related activities deteriorated. Plaintiff was no longer able to get along with others and plaintiff's motivation was poor. Plaintiff had low self reliance and showed symptoms compromising her ability to withstand stress associated with day to day activities. Dr. Bronson opined that plaintiff was capable only of performing repetitive tasks in a sheltered workshop. Psychologist Bernstein opined that plaintiff was unemployable because she had problems relating to others and with meeting schedules. Plaintiff admitted during counseling that she was becoming more tolerant of and losing control of her drug use and that she suffered a social and occupational impairment on account of her drug use. There is no evidence on the record showing that plaintiff exhibited these debilitating traits prior to her daily use of drugs and her diagnosis of drug dependence. As such, the ALJ's determination that plaintiff's drug use was material to his finding of disability is supported by substantial evidence on the record. Therefore, the

Court should not disturb the ALJ's decision. *See Smith v. Chater,* 99 F.3d 635, 638–39 (4th Cir.1996).

To the extent plaintiff argues that evidence shows plaintiff's drug problem to have resolved, the undersigned notes that the evidence on the record is tenuous, at best, to support this assertion. In August 1993, two months after plaintiff's unsuccessful attempt at drug treatment, Dr. Moghaddas noted that plaintiff had no history of drug abuse. Such a finding is contrary to the evidence contained in the record. In August 1994, Psychologist Bernstein noted that plaintiff overdosed on drugs in the past when she associated with undesirable people but that the "problem [had] been overcome." Plaintiff argues that Mr. Bernstein's conclusion, that plaintiff had overcome the problem, is evidence that plaintiff's drug problem had resolved. However, it is unclear to what problem Mr. Bernstein was referring, that is, whether it was plaintiff's drug use, plaintiff's association with undesirable people, or plaintiff's propensity to overdose on drugs. Finally, although Mr. Bernstein noted that plaintiff no longer used drugs, this conclusion appears to be based on plaintiff's statements rather than documented evidence. Further, this statement is questioned inasmuch as plaintiff reported no history of drug abuse to Dr. Moghaddas only two months after an unsuccessful attempt at drug treatment.

■ Assuming arguendo that the evidence cited by plaintiff is sufficient to support a claim that plaintiff's drug problem has resolved, the ALJ's decision nevertheless must be affirmed inasmuch as it is supported by substantial evidence. *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993) (quoting *Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir. 1992)) (where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome).

Therefore, because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff's drug dependency is a contributing factor material to a finding of disability should be affirmed.

**B. *Denial of Child's Benefits***

■ Plaintiff claims that the ALJ erred when he found plaintiff not to be entitled to child's disability benefits inasmuch as the evidence showed plaintiff to be disabled prior to attaining twenty-two years of age.

To be entitled to children's benefits on the earnings record of her mother or father, plaintiff must have a disability that began before she attained twenty-two years of age. 20 C.F.R. § 404.350(a). The ALJ found the evidence not to support a finding that plaintiff was disabled prior to attaining twenty-two years of age:

> The claimant worked many years after this and had substantial earnings. Although, she alleges that she was only able to function appropriately in the work setting because her mother was there to assist her, no evidence has been submitted to support this conclusion. Further although she alleges brain damage from receiving too much oxygen during a surgery in infancy, there is no evidence of any complication during the 1957 hernia repair surgery. For these reasons, the undersigned does not find the claimant entitled to Disabled Child's benefits....

(Tr. 22.)

The ALJ's finding is supported by substantial evidence on the record as a whole. Plaintiff was born on July 1, 1957. (Tr. 145.) Thus, plaintiff must show that her disability began before July 1, 1979. The evidence on the record shows that plaintiff was employed for over six years at one job beginning in 1974. Other than plaintiff's unsupported assertion to the contrary, there is no evidence that plaintiff was able to work at this job during this period only because she had a job coach. In addition, there is evidence that plaintiff's IQ steadily increased between 1964 and 1978 so as to place plaintiff at the average level of intelligence. Although in 1978 the Center for Psychological Services found plaintiff's competence for general, everyday matters to be below potential, the Center determined this to be mostly on account of restricted experiences. Finally, although plaintiff claims that surgical error during her

hernia operation in September 1957 caused her to be disabled since infancy, the ALJ correctly noted that her to be disabled since infancy, the ALJ correctly noted that there is no evidence in the record to support this assertion. Indeed, there is no evidence to support plaintiff's claim that she was disabled prior to July 1, 1979. Therefore, the ALJ's finding substantial evidence on the record as a whole.

Because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff's disability did not begin prior to her attaining twenty-two years of age should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that plaintiff's Motion for Summary Judgment (Docket No. 8) be denied.

**IT IS FURTHER RECOMMENDED** that defendant's Motion for Summary Judgment (Docket No. 11) be granted.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. *Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir.1990).